716 F.2d 646
 1983-2 Trade Cases 65,632
 Gary R. PARKS, and Max Ansola, Jr., a partnership, dba
Klamath Valley Company,
Plaintiffs-Appellants-Cross-Appellees,
v.
James WATSON, personally and in his official capacity as
City Manager for the City of Klamath Falls; and the City of
Klamath Falls, an Oregon municipal corporation,
Defendants-Appellees-Cross-Appellants.
 Nos. 80-3416, 80-3458.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 7, 1982.
Decided Sept. 22, 1983.
 
 Timothy J. Sercombe, Johnson, Harrang, Swanson & Long, Eugene, Or., for plaintiffs-appellants-cross-appellees.
 Charles F. Hinkle, Stoel, Rives, Boley, Fraser & Wyse, Portland, Or., for defendants-appellees-cross-appellants.
 Appeal from the United States District Court for the District of Oregon.
 Before BROWNING, Chief Judge, and WALLACE and BOOCHEVER, Circuit Judges.
 PER CURIAM:
 
 
 1
 Gary R. Parks and Max Ansola, Jr., partners in Klamath Valley Company (hereinafter referred to as "Klamath"), appeal from a summary judgment for the City of Klamath Falls, Oregon and its manager Watson (hereinafter collectively referred to as "the City"), in an action under the Civil Rights Act, 42 U.S.C. Sec. 1983 (Supp. V 1981), and the Sherman Act, 15 U.S.C. Secs. 1, 2 (1976). In a cross-appeal, the City challenges the district court's denial of its motion for an award of attorneys' fees under 42 U.S.C. Sec. 1988 (1976). Klamath's section 1983 and antitrust claims both arose from the City's denial of a request to vacate certain platted City streets unless Klamath dedicated to the City land containing geothermal wells. Klamath's section 1983 claim raises issues involving an alleged taking of property without just compensation and the denial of due process and equal protection under the fifth and fourteenth amendments. Its antitrust action raises issues involving standing under sections 4 and 16 of the Clayton Act, 15 U.S.C. Secs. 15 (Supp. V 1981), 26 (1976), as well as questions of antitrust immunity and jurisdiction. We affirm in part and reverse and remand in part.
 
 I.
 Factual Background
 
 2
 In 1978, Klamath acquired two tracts of property located adjacent to Old Fort Road in the city of Klamath Falls. There are four geothermal wells located on the property--two in the northern tract and two in the southern tract. One of the wells in the southern tract is currently operational, providing heat for ten homes located on the tract. Klamath planned to construct 214 apartment units on the northern tract and to heat them with the main geothermal well on the northern tract. Klamath pursued this plan by hiring geothermal heating consultants, developing economic projections and engineering plans, securing a commitment of venture capital, and obtaining a geothermal water permit from the State of Oregon. Klamath also investigated possible uses of the surplus energy produced by the wells which would be available after providing for the existing residences and projected apartment units. Klamath attempted to apply to the City for a utility franchise but was refused an application.
 
 
 3
 In order to develop its apartment complex, Klamath needed both a zoning change and the vacation of platted City streets on the property. After the City Planning Commission recommended approval of the proposed street vacations and zoning change, the City Council voted to rezone the apartment parcel to allow more dense residential uses.
 
 
 4
 Things did not go smoothly with Klamath's vacation petition. The City charter provides that when the City vacates a street, the party to whom the property reverts must pay the City just compensation. Negotiations on compensation for the requested vacation occurred between December 1978 and July 1979. Although the parties' description of the preliminary negotiations differ somewhat, the ultimate disagreement between the City and Klamath is quite clear. Klamath was willing to pay $1.00 for each square foot of street that was vacated, and to convey to the City an easement for a 20-foot strip of property near Old Fort Road. However, the City wanted the dedication of that property, because fee ownership of this 20-foot strip of property would give the City rights to the geothermal wells on the northern tract. Klamath did not agree to the dedication. On July 16, 1979, the City Council voted unanimously to deny Klamath's vacation petition. Consequently, Klamath was unable to construct its apartment complex as planned.
 
 
 5
 Klamath brought suit against the City for conspiracy to restrain competition in and to monopolize the Klamath Falls geothermal heating market. Specifically, Klamath's complaint alleged that by refusing to permit the street vacation for reasonable compensation, the City and others combined to restrain unreasonably the marketing of residential heating by Klamath to potential purchasers in violation of section 1 of the Sherman Act, 15 U.S.C. Sec. 1 (1976). Klamath further alleged that the City denied its vacation request with the intent to create a monopoly in the geothermal heating market in violation of section 2 of the Sherman Act, 15 U.S.C. Sec. 2 (1976), and that the City violated its constitutional rights by denying the vacation petition.
 
 
 6
 After the pleadings were filed, the City took the deposition of Parks. Klamath then served a set of interrogatories and a request for production of documents. Thereafter, the City moved for partial summary judgment on the antitrust claims and for a stay of discovery. The motion was granted. The City then moved for summary judgment on the section 1983 claims. Klamath filed a motion under rule 56(f) claiming an inability to obtain discovery. The district court concluded that discovery would not aid Klamath in establishing a violation of its civil rights and granted the City's motion. The City then moved for an award of attorney's fees on the civil rights portion of the case pursuant to 42 U.S.C. Sec. 1988 (1976), asserting that Klamath's suit was "without foundation." The district court denied the motion.
 
 II.
 
 7
 The Fifth Amendment Claims--Unconstitutional Condition
 
 
 8
 Klamath's first taking claim is based on the doctrine of unconstitutional conditions which the Supreme Court reaffirmed in Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). The Court held that "even though a person has no 'right' to a valuable governmental benefit", and even though the government may deny the benefit at its discretion, the government may not impose a choice between the government benefit and the exercise of a constitutionally guaranteed right. Id. at 597, 92 S.Ct. at 2697. "Such interference with constitutional rights is impermissible." Id. Klamath argues that the City's action has required it to choose between the street vacation and its right under the fifth amendment to just compensation for its geothermal wells. The City does not dispute that the value of the land it sought in exchange for the street vacations greatly exceeds the value of the platted streets. Rather, the City argues that Klamath has no right to just compensation since Klamath's property was never taken.
 
 
 9
 The City, as well as the district court, relies on our decision in Portland General Electric Co. v. Federal Power Commission, 328 F.2d 165 (9th Cir.1964). There we held that licenses issued by the federal government containing conditions whereby the licensee was required to convey certain property or furnish services to the United States free of charge, did not constitute a taking of property without due process of law. We reasoned that "[i]t is not a taking for the Government to withhold a benefit it is not contractually or constitutionally obliged to confer[, n]or is it a taking for the Government to impose financial obligations upon the recipient of a benefit if, as here, the benefit may be declined." Id. at 173. Unlike the condition imposed on Klamath, however, those required in Portland General were directly related to the subject of the requested license, navigational rights. Without that distinction, Portland General appears to be in conflict with Perry. Under Perry, the government cannot avoid the application of the unconstitutional conditions doctrine by defining a taking to exclude those situations where the government benefit can be withheld at the discretion of the government.
 
 
 10
 Even though Perry must be read as limiting the government's ability to impose conditions, financial or otherwise, on the granting of its largess, such limitations only arise when the condition attached infringes on a constitutionally protected interest. Thus, in order for Klamath to establish that an unconstitutional condition was demanded, the City's condition must amount to a taking of property without due process of law. The City concludes that under the reasoning of Honolulu Rapid Transit Co. v. Dolim, 459 F.2d 551 (9th Cir.), cert. denied, 409 U.S. 875, 93 S.Ct. 124, 34 L.Ed.2d 128 (1972), which we decided before Perry, a taking of property is not involved when the City negotiates the price for vacating its streets.
 
 
 11
 In Honolulu, the Honolulu Rapid Transit Company received a franchise from the City of Honolulu in 1921 to provide public transportation. A section of that franchise permitted the City of Honolulu to purchase the company's property for an amount, excluding the value of goodwill and other intangibles, to be determined by the Public Utilities Commission. In 1970, the City of Honolulu attempted to purchase the property of the company pursuant to the franchise terms. The company claimed that even though the government had an absolute power to grant or withhold the franchise, the City could not exact a waiver of the company's constitutional right to receive just compensation for the taking of its property for public use as the price for granting of the franchise. Although we recognized the unconstitutional conditions doctrine, id. at 552 n. 2, we wrote;
 
 
 12
 ... HRT disregards the fact that there was here no "taking" by the City. This was not a unilateral exercise by the City of its power of eminent domain. The right of the City to acquire HRT's property at a certain price was not based upon its power to take, but upon agreement between the parties. Thus, there was no event to which HRT's asserted constitutional rights attached. The transaction had "passed out of the range of the Fifth Amendment" and was a situation where "Parties, supposedly with due regard to their own interests, bargain between themselves as to compensation."
 
 
 13
 Id. at 553 (quoting Albrecht v. United States, 329 U.S. 599, 603-04, 67 S.Ct. 606, 608-09, 91 L.Ed. 532 (1947)).
 
 
 14
 Honolulu is different from the present case because there the imposed condition directly related to the subject of the franchise, public transportation. In contrast, the requirement that Klamath convey its geothermal property has no relationship to the public's interest in the vacation of the streets.[1]
 
 
 15
 Honolulu may also be distinguished by the fact that the transit company, after entering into the agreement, accepted the benefits of the monopolistic franchise for almost fifty years before contending that the condition was unconstitutional. If the issue had been raised promptly, as was done here, the city could well have received additional compensation for the franchise. While estoppel is not specifically made a ground for the decision, it is strongly suggested. 459 F.2d at 553 n. 3.
 
 
 16
 The City also argues that Klamath was free to reject the terms. That fact, however, does not render the condition placed on obtaining the street vacation any less objectionable. Perry 's focus is on the propriety of the condition imposed on receiving the discretionary benefit, not on whether the party was compelled to accept the condition. The employee in Perry was obviously free to decline the position. Claimants in some unconstitutional conditional cases have accepted the condition before challenging it, see, e.g., Western & Southern Life Ins. Co. v. State Board of Equalization, 451 U.S. 648, 655-668, 101 S.Ct. 2070, 2076-2083, 68 L.Ed.2d 514 (1981) (claimant gave up right to equal protection as condition of doing business in state), but in most cases the claimants, like the teacher in Perry, were denied a benefit because they refused to accede to the condition they challenged. See, e.g., Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958) (claimants denied tax exemptions because they refused to subscribe oaths); Elfbrandt v. Russell, 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966) (claimants denied employment because they failed to subscribe oaths).
 
 
 17
 The City's contention that Klamath was not forced to choose between the vacation and its right to just compensation because no taking occurred is specious. No taking occurred solely because Klamath chose to reject the unconstitutional condition placed on obtaining vacation.
 
 
 18
 For purposes of summary judgment, we must accept as true the evidence indicating that the City's demand for the well sites was totally unrelated to its legitimate interest in receiving compensation for vacation.[2] Thus, even though Klamath was willing to pay more than a fair amount for the vacation, the City refused to vacate unless Klamath also dedicated the well sites without just compensation. The record suggests that the City was manipulating its vacation authority to exert leverage on Klamath to dedicate the well-site property for little or no compensation.[3] The record further suggests that the City imposed the condition to avoid going through condemnation proceedings to obtain the wells. While governmental entities may negotiate agreements aggressively, Perry holds that they must stop short of imposing unconstitutional conditions. Thus, just as a public employer may not condition an employment contract on the employee forsaking his first amendment rights, Perry, 408 U.S. at 598, 92 S.Ct. at 2698, the City may not condition street vacation on Klamath waiving its fifth amendment right to just compensation for the geothermal wells.
 
 
 19
 Both case authority and scholarly commentary indicate that a condition requiring an applicant for a governmental benefit to forgo a constitutional right is unlawful if the condition is not rationally related to the benefit conferred. In Frost & Frost Trucking Co. v. Railroad Commission, 271 U.S. 583, 46 S.Ct. 605, 70 L.Ed. 1101 (1926), for example, the Supreme Court noted that the California state supreme court had construed the challenged statute as offering the "special privilege of using the public highways to the private carrier for compensation upon condition that he shall dedicate his property to the quasi-public use of public transportation". 271 U.S. at 591, 46 S.Ct. at 606. The Supreme Court emphasized that the condition imposed was unrelated to the legitimate state purpose of highway regulation:
 
 
 20
 It is very clear that the act, as thus applied, is in no real sense a regulation of the use of the public highways. It is a regulation of the business of those who are engaged in using them. Its primary purpose evidently is to protect the business of those who are common carriers in fact by controlling competitive conditions. Protection or conservation of the highways is not involved.
 
 
 21
 Id.
 
 
 22
 The controlling nature of the absence of a rational relationship between the condition imposed and the benefit conferred was noted in Stephenson v. Binford, 287 U.S. 251, 275, 53 S.Ct. 181, 188, 77 L.Ed. 288 (1932):
 
 
 23
 An entirely different question was presented in the Frost Trucking case, supra. There, as we pointed out ( [271 U.S.] pp. 591-92 [46 S.Ct. pp. 606-07], the California act, as construed by the highest court of the state, was in no real sense a regulation of the use of the public highways. Its purpose was to protect the business of those who were common carriers in fact by controlling competitive conditions. Protection or conservation of the highways was not involved. The condition which constrained the private contract carrier to become a common carrier, therefore, had no relation to the highways. In this view, the use of the highways furnished a purely unrelated occasion for imposing the unconstitutional condition, affording no firmer basis for that condition than would have been the case if the contract carrier were using a road in private ownership.
 
 
 24
 The Texas statute, on the contrary, rests definitely upon the policy of highway conservation, ...
 
 
 25
 (emphasis added) (footnote omitted). See Comment, Unconstitutional Conditions, 73 Harv.L.Rev. 1595, 1600 (1960); Hale, Unconstitutional Conditions and Constitutional Rights, 35 Colum.L.Rev. 321, 353 (1935).
 
 
 26
 On the other hand, conditions requiring relinquishment of a constitutional right have been upheld when the condition was related to the benefit conferred. Honolulu is such a case. The cases relied upon in Honolulu (including Portland General ), all sustained licenses for construction of dams in navigable rivers which contained conditions that were related to the government's interest in the control of navigation. United States v. Appalachian Electric Power Co., 311 U.S. 377, 426-27, 61 S.Ct. 291, 308, 85 L.Ed. 243 (1940); Fox River Paper Co. v. Railroad Commission, 274 U.S. 651, 47 S.Ct. 669, 71 L.Ed. 1279 (1927); Portland General Electric Co. v. Federal Power Commission, 328 F.2d 165, 169 n. 6 (9th Cir.1964).
 
 
 27
 "Subdivision exaction" cases are closely analogous to street vacations. A city allows a developer to subdivide land in return for a contribution, typically of land for streets within the subdivision or for a park or school. The developer then challenges the requirement as a taking without just compensation. At one extreme, the older Illinois rule "permits an exaction only if the 'need' for the facility being financed is 'specifically and uniquely attributable' to the subdivider's development." Ellickson, Suburban Growth Controls: An Economic and Legal Analysis, 86 Yale L.J. 385, 481-82 (1977); Pioneer Trust & Savings Bank v. Village of Mount Prospect, 22 Ill.2d 375, 176 N.E.2d 799, 802 (1961). But see Plote, Inc. v. Minnesota Alden Co., 96 Ill.App.3d 1001, 422 N.E.2d 231, 235-36, 52 Ill.Dec. 550, 554-55 (1981). At the other extreme, California requires only that the exaction have some relationship to the needs of the subdivision or to the increased needs of the city caused by the additional population brought by the subdivision. Associated Home Builders v. City of Walnut Creek, 4 Cal.3d 633, 640-41, 484 P.2d 606, 611-13, 94 Cal.Rptr. 630, 635-37, appeal dismissed, 404 U.S. 878, 92 S.Ct. 202, 30 L.Ed.2d 159 (1971). But there is agreement among the states "that the dedication should have some reasonable relationship to the needs created by the subdivision." Call v. City of West Jordan, 606 P.2d 217, 220 (Utah 1979) (footnote omitted).
 
 
 28
 Since the requirement that Klamath Valley Company give its geothermal wells to the City had no rational relationship to any public purpose related to the vacation of the platted streets, the unrelated purpose does not support the requirement that the company surrender its property without just compensation. Frost and Perry control rather than Portland General and Honolulu. The condition violates the fifth amendment.
 
 
 29
 We have previously referred to the fact that the case comes to us on the grant of a summary judgment. The City appears to deny that its purpose was to acquire the geothermal sites. The City contends there was also a dispute of fact as to whether vacation of the platted streets was denied instead because the City was concerned about public access and because plaintiffs had refused to submit certain conceptual drawings. Remand therefore is required to resolve these factual issues.
 
 
 30
 In view of our disposition of Klamath's claim that it is improper to condition the vacation of the street on the relinquishment of its constitutionally guaranteed right to just compensation for the taking of its geothermal wells, it is unnecessary for us to address its more tenuous contention that the City's vacation denial, coupled with its announced plan to appropriate its well sites, show an intent to freeze land values in order to make future condemnations less expensive. Our holding prohibits the City from conditioning the denial of the vacations on relinquishment of the rights to compensation for the wells.
 
 III.
 Equal Protection
 
 31
 Klamath claims that it was denied equal protection of the laws when the City treated it differently from other vacation petitioners. It argues that in the past, street vacations were allowed for compensation of $0.30-$0.40 per square foot. Here, the City required $1.00 per square foot plus the well site property dedication. Klamath is willing to pay the $1.00 rate but contends that requiring it to relinquish the well site violates its equal protection rights. We assume for purposes of this question that the City did in fact require such additional compensation in this case.
 
 
 32
 Absent a suspect classification or the infringement of a fundamental right, neither of which are present here, the equal protection clause is offended only if the City's different treatment of Klamath bears no rational relationship to a legitimate governmental purpose. San Antonio Independent School Dist. v. Rodriguez, 411 U.S. 1, 40, 93 S.Ct. 1278, 1300, 36 L.Ed.2d 16 (1973).
 
 
 33
 In arguing that the City's vacation decision satisfies this standard, the City submits three governmental reasons: (1) Klamath's noncompliance with the City's request that it submit conceptual drawings of the street realignment, (2) a concern over the problem of public access, and (3) a desire to acquire Klamath's geothermal wells for the City's proposed geothermal heating district. It appears that material issues of fact exist as to whether Klamath failed to submit drawings and whether there was concern over access. Both of the governmental purposes could rationally support the vacation denial. Because of the factual dispute, however, summary judgment would be inappropriate on either of these grounds.[4] The City's third assertion of a rational relation is more difficult to resolve. The district court stated that "[i]f the plaintiffs were able to show through discovery that the City was motivated by a desire to acquire the wells, that would still be a rational basis for treating plaintiffs' request differently from other similar requests." Klamath admits that its wells were located within the City's planned geothermal district and that the City's ultimate goal in conditioning the vacation on the dedication of its well-site property was to acquire the wells for the public. We are thus confronted with the question of whether the City's legitimate governmental purpose of acquiring the well sites was rationally related to the vacation of the streets. San Antonio Independent School Dist. v. Rodriguez, 411 U.S. 1, 40, 93 S.Ct. 1278, 1300, 36 L.Ed.2d 16 (1973). What we have said in the discussion of unconstitutional conditions largely dictates our answer to this question. There is no rational basis for distinguishing between those seeking vacations of streets who own geothermal wells and those who do not. Ownership of such wells has no relationship to vacation of streets, nor is it argued that the value of the wells is in any way related to the value of the land being vacated.[5]
 
 
 34
 Equal protection analysis requires that the challenged distinction be reasonable in light of the legislation or activity in question--in this case, street vacation. See Zobel v. Williams, 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982); cf. County Board of Arlington County v. Richards, 434 U.S. 5, 7, 98 S.Ct. 24, 26, 54 L.Ed.2d 4 (1977) (per curiam). "The Equal Protection Clause requires only that the distinction drawn by an ordinance like Arlington's rationally promote the regulation's objective." 434 U.S. at 7, 98 S.Ct. at 26 (citations omitted). The heating-district justification has nothing to do with the City's legitimate interest in vacation matters.
 
 
 35
 Section 271.120 of the Oregon Revised Statutes provides that, in ruling on a vacation petition, the governing body:
 
 
 36
 shall determine whether the consent of the owners of the requisite area has been obtained, whether notice has been duly given and whether the public interest will be prejudiced by the vacation ... If such matters are determined in favor of the petition the governing body shall ... vacate....
 
 
 37
 Or.Rev.Stat. Sec. 271.120 (1981) (emphasis added).
 
 
 38
 The City's principal concern in vacation matters therefore is to insure that the public interest in the possible use of the platted streets is not prejudiced. The fact that Klamath happens to possess valuable geothermal wells desired by the City is totally unrelated to the City's legitimate interests in street vacations. The distinction drawn between Klamath and others who secured vacations was not rationally related to any cognizable governmental interest in vacation and is precisely the sort of arbitrary discrimination proscribed by the equal protection clause. The Supreme Court recently rejected a state's attempt to justify a discriminatory classification borrowed from a federal regulation because the legitimate governmental interests served by the regulation were unrelated to the purpose of the state's legislation. In the Court's words:
 
 
 39
 [T]o justify its use as a criterion for its own discriminatory policy, the State must demonstrate that the classification is reasonably adapted to 'the purposes for which the state desires to use it.'
 
 
 40
 Plyler v. Doe, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (emphasis in original) (quoting Oyama v. California, 332 U.S. 633, 664-65, 68 S.Ct. 269, 284, 92 L.Ed. 249 (1948) (Murphy, J., concurring)). There is no justification for distinguishing between vacation petitioners according to whether they possess geothermal wells. To conclude otherwise would permit a city to deny any discretionary benefit, be it a business license, a street vacation, or a parking permit, to a party owning property the city seeks to condemn unless such property is donated to the city. We conclude that the City's interest in acquiring the property is totally unrelated to its statutorily defined interest in determining whether to grant the discretionary benefit, and violates the equal protection clause. Comment, Unconstitutional Conditions, 73 Harv.L.Rev. 1595, 1600 (1960). See Western & Southern Life Insurance Co. v. State Board of Equalization, 451 U.S. 648, 656-57, 101 S.Ct. 2070, 2076-77, 68 L.Ed.2d 514 (1981).
 
 IV.
 Procedural Due Process
 
 41
 Klamath also asserts a procedural due process claim based upon three grounds: first, that City Council meetings on the subject of its vacation application were held in secret; second, that the decisionmakers had a pecuniary interest in the well sites; and third, that there were no standards articulated in advance to guide the City in its decision on the application. Before Klamath can prevail on these claims, however, it must demonstrate the threshold requirement of a constitutionally cognizable right. Because the requirements of procedural due process apply only to the deprivation of interests encompassed by the fourteenth amendment's protection of liberty and property, Board of Regents v. Roth, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972), we must determine whether Klamath, as a vacation petitioner, had such an interest protected by the due process clause. No liberty interest is claimed. A property interest in a benefit protected by the due process clause results from a "legitimate claim of entitlement" created and defined by an independent source, such as state or federal law. Id. at 577, 92 S.Ct. at 2709; Bishop v. Wood, 426 U.S. 341, 344 & n. 7, 96 S.Ct. 2074, 2077 & n. 7, 48 L.Ed.2d 684 (1976).
 
 
 42
 Klamath argues that it has a legitimate claim of entitlement to the street vacation either by operation of the December 21, 1978 agreement with the City[6] or, alternatively, because Oregon law provides for a public hearing on vacation petitions. A contract between the City and Klamath in which the City agreed to vacate the streets would give Klamath a claim of entitlement of the kind discussed by the Supreme Court in Roth. Yet as we view the December 21, 1978 agreement, it does not confer any such entitlement to the requested street vacation. The district judge stated that the "agreement describes the various conditions to be met by the plaintiffs in planning their development. Some of the conditions imply the vacation will occur.... However, there is no agreement by the City to vacate and the City was under no legal obligation to vacate." Klamath argues that by its terms the contract contemplates a vacation. Upon examination of the document, we agree with the district court that it merely lists conditions with which Klamath was required to comply in order to proceed with its development and does not impose any affirmative duty upon the City to vacate. Although a recognizable property interest could be created by an implied rather than an express contract, Bishop v. Wood, 426 U.S. at 344, 96 S.Ct. at 2077, or by some other "mutually explicit understandings," Perry, 408 U.S. at 601, 92 S.Ct. at 2699, we do not find a right to street vacation implicit in the language of the document. Klamath has not argued that there was a prevailing custom or other understanding with the City that would give it a legitimate claim of entitlement.
 
 
 43
 Klamath's alternative basis for a property interest is Or.Rev.Stat. Sec. 271.100, which directs the City Council to hold a formal hearing upon all vacation petitions where there "appears to be no reason" not to allow the petition. The question before us is whether this statement changes what otherwise would be "an abstract need or desire" or "a unilateral expectation" into "a legitimate claim of entitlement". Roth, 408 U.S. at 577, 92 S.Ct. at 2709.
 
 
 44
 Although there is some debate whether state statutes providing for particular procedures amount to "entitlements" protected by due process, see Comment, Protecting State Procedural Rights in Federal Court: A New Role for Substantive Due Process, 30 Stan.L.Rev. 1019, 1042-50 (1978), the rule in this circuit is that they do. Mabey v. Reagan, 537 F.2d 1036, 1042 (9th Cir.1976); cf. Bills v. Henderson, 631 F.2d 1287, 1298-99 (6th Cir.1980) (holding "every deviation from state procedures cannot be viewed as a federal constitutional violation", id. at 1299, and citing Mabey as contrary authority). In Jacobson v. Hannifin, 627 F.2d 177 (9th Cir.1980), we were faced with a similar question. There the plaintiff was denied a request for licensing as a hotel-casino landlord by the Nevada Gaming Control Board. The plaintiff argued that a protectable interest was created by certain procedural requirements of the Nevada Gaming Control Act. We stated that "[p]rocedural guarantees ordinarily do not transform a unilateral expectation into a constitutionally protected interest." Id. at 180 (citing Hayward v. Henderson, 623 F.2d 596 (9th Cir.1980); Wells Fargo Armored Service Corp. v. Georgia Public Service Commission, 547 F.2d 938, 942 (5th Cir.1977); Lake Michigan College Federation of Teachers v. Lake Michigan Community College, 518 F.2d 1091, 1095 (6th Cir.1975), cert. denied, 427 U.S. 904, 96 S.Ct. 3189, 49 L.Ed.2d 1197 (1976)). See also Suckle v. Madison General Hospital, 499 F.2d 1364, 1366 (7th Cir.1974). We observed, however, that if the procedural requirements were intended to operate as a "significant substantive restriction" on the agency's actions, a property interest might be created. Jacobson v. Hannifin, 627 F.2d at 180; see Davis v. Oregon State University, 591 F.2d 493, 497 (9th Cir.1978). We concluded, however, that since the Gaming Control Act unmistakably committed the substance of licensing decisions to the discretion of the Commission, the procedural guarantees provided for in the Act did not enhance an applicant's expectation of obtaining a license to a degree sufficient to create a protectable interest. 627 F.2d at 180.
 
 
 45
 In Jacobson, the statute granted to the Nevada Gaming Commission "full and absolute authority to deny any application for any cause deemed reasonable by such commission." Nev.Rev.Stat. Sec. 463.220(6). It is difficult to conceive of language which could more forcefully leave a decision to the unbridled discretion of an agency. In contrast, here Or.Rev.Stat. Sec. 271.120 (1981) specifies that in ruling on a vacation petition, the agency "shall" determine (1) "whether the consent of the owners of the requisite area has been obtained", (2) "whether notice has been duly given", and (3) "whether the public interest will be prejudiced by the vacation." The Oregon statute mandates that if the three matters are determined in favor of the petition the governing body shall vacate the streets. Once the conditions are met the city lacks discretionary powers.
 
 
 46
 The first two conditions are factual, involving no discretion. We believe that a determination as to whether the public interest will be prejudiced, while obviously giving a certain amount of play in the decisional process, defines an articulable standard. At the least, the agency would have to specify a legitimate public interest that would be prejudiced. As we have indicated previously a factual question exists as to whether such public interest has been made a basis for the City's decision.
 
 
 47
 We believe that the statutory scheme placed significant substantive restrictions on the agency's actions so as to confer due process rights. Factual issues remain as to whether the conditions requiring the vacation were met and as to the nature of the process afforded Klamath. Accordingly, the award of summary judgment must be reversed.
 
 V.
 Dismissal of Antitrust Claims
 
 48
 Klamath's complaint alleged that the City's anticompetitive actions prevented it from developing its property as planned, including exploitation of its geothermal wells to heat housing units to be constructed on its property, and from marketing geothermal heat to consumers outside of its own development. Klamath brought a claim for the monetary damages under section 4 of the Clayton Act and for injunctive relief pursuant to section 16 of the Clayton Act. The district court granted the City's motion for summary judgment on both claims on the ground that Klamath lacked standing to sue under either of these sections.
 
 
 49
 A. Standing Under Section 4 of the Clayton Act.
 
 
 50
 Section 4 of the Clayton Act, 15 U.S.C. Sec. 15 (Supp. IV 1980), provides a private treble-damage cause of action for parties injured by antitrust violations such as those alleged by Klamath in its complaint: violations of sections 1 and 2 of the Sherman Act. Section 4 provides in part:Any person who shall be injured in his business or property by reasons of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.
 
 
 51
 Although the statute could be read as affording relief to all persons whose injuries are causally related to an antitrust violation, the parties entitled to relief under this section have been limited by restrictions on standing. See In re Multidistrict Vehicle Air Pollution, 481 F.2d 122, 125-29 (9th Cir.), cert. denied, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973). We have held:
 
 
 52
 In order to have standing under section 4 the plaintiff must allege nonconclusory facts establishing that there has been injury to the plaintiff's business or property and that the injury to the plaintiff's business or property occurred "by reason of" the antitrust violation. The plaintiff's claim may be dismissed for lack of standing as a matter of law, John Lenore & Co. v. Olympia Brewing Co., 550 F.2d 495, 500 (9th Cir.1977), where there is an insufficient showing of causation. However, if the plaintiff states sufficient facts to support his allegations that an antitrust violation has occurred and that he has sustained injury to his business or property, he is generally entitled to go to the jury on the violation and injury issues. These two determinations, unlike causation, are not questions of law; they are questions of fact.
 
 
 53
 Solinger v. A & M Records, Inc., 586 F.2d 1304, 1309 (9th Cir.1978), cert. denied, 441 U.S. 908, 99 S.Ct. 1999, 60 L.Ed.2d 377 (1979).
 
 
 54
 In the present case, the district judge did not find it necessary to decide whether Klamath had stated facts sufficient to support its allegations of an antitrust violation, nor did he pass directly upon the issue of causation. Rather, he concluded that Klamath had not sustained injury to its business or property. In deciding that Klamath failed to establish injury to its business or property, the district judge limited his inquiry to whether Klamath had sustained injury to its business in the market for commercial (off-site) sale of geothermal heat. The district judge excluded consideration of whether Klamath sustained injury to either its residential property development business or its on-site geothermal heating business. He concluded, as a matter of law, that the only injury which could have occurred "by reason of" the alleged antitrust violations was injury to Klamath's off-site geothermal heating business. Thus, the district court limited its inquiry to the off-site business by an application of causation analysis and then held the City entitled to summary judgment as to that business interest.
 
 
 55
 We have used the "target area" approach in determining whether a plaintiff's injury occurred "by reason of" the alleged antitrust violation. John Lenore & Co. v. Olympia Brewing Co., 550 F.2d 495, 499 (9th Cir.1977); In re Multidistrict Vehicle Air Pollution, 481 F.2d at 129. Under this analysis we must first identify the affected area of the economy which is the target of the alleged anticompetitive conduct. Second, it must be determined whether the alleged injury was within that area. Id.; see also Blankenship v. Hearst Corp., 519 F.2d 418, 426 (9th Cir.1975). In determining the target area, we have used a foreseeability analysis when a plaintiff alleges violations of sections 1 and 2 of the Sherman Act. Solinger v. A & M Records, Inc., 586 F.2d at 1311. Thus, a plaintiff must show that the injury occurred within an area of the economy that foreseeably would have been affected by the antitrust violation alleged. See, e.g., In re Western Liquid Asphalt Cases, 487 F.2d 191, 199 (9th Cir.1973), cert. denied, 415 U.S. 919, 94 S.Ct. 1419, 39 L.Ed.2d 474 (1974) (indirect purchaser in the chain of distribution foreseeably injured by price-fixing conspiracy); Hoopes v. Union Oil Co., 374 F.2d 480, 485 (9th Cir.1967) (lessee's interest in certain properties sufficient to allow standing to sue for alleged antitrust violation, despite the fact that the lessor could also have sued). If no clear answer emerges we must determine standing by balancing competing policy interests, principally those of effective enforcement of the antitrust laws on the one hand and avoiding vexatious litigation and excessive liability on the other. Ostrofe v. H.S. Crocker Co., 670 F.2d 1378, 1383-86 (9th Cir.1982), vacated and remanded, --- U.S. ----, 103 S.Ct. 1244, 75 L.Ed.2d 475 (1983); see, Associated General Contractors of California v. California State Council of Carpenters, --- U.S. ---- at ----, 103 S.Ct. 897 at 907-08, 74 L.Ed.2d 723 (1983).
 
 
 56
 In this case, Klamath might have been injured in any or all of three businesses or property interests: the development of residential housing on its northern tract, supplying geothermal heat to that proposed development, or supplying geothermal heat to outside consumers. If, as Klamath alleges, the market that is affected by the City's alleged anticompetitive conduct is the geothermal heat market, then we must agree with the district court that Klamath's inability to develop its property as a residential apartment complex cannot be in that area of the economy. On the other hand, Klamath's proposed off-site geothermal heat business is certainly within that target area. Finally, we cannot agree with the district court that injury to Klamath's on-site geothermal heating business is not within an area of the economy that foreseeably would have been affected by the antitrust violations alleged.
 
 
 57
 The district judge stated that, "[s]upplying heat to one's own building is not a 'market' or an 'area of economy' in which there can be competitive or anticompetitive behavior." We can see no justification for this conclusion. Klamath is not seeking to provide heat for its own private consumption. It wishes to supply geothermal heat to future residents of its planned apartment development, but alleges that its efforts have been stifled by the City's anticompetitive acts. These future residents represent potential customers for the City or any other supplier of geothermal heat. The fact that Klamath may own the development in which these potential consumers of geothermal heat live cannot, by itself, foreclose the possibility that these future residents will constitute a portion of the market for which all geothermal heat suppliers will compete. Even if it could be hypothesized that the owner of a given development could create a kind of "natural monopoly" by physically excluding competing suppliers from offering their heat to residents, this does not mean that these apartments are not part of the potential geothermal market. For instance, Klamath might sell its apartment complex and retain its wells. Thus, even though it might be able initially to foreclose other competitors from supplying heat to residents of its development, once there is a change of apartment ownership it will no longer be assured that other suppliers would not compete for its customers. Even if it remained the owner of both the well sites and the apartment complex, and decided at first to be the sole supplier of the heating for these residents, Klamath could, in the future, welcome an outside supplier of geothermal heat if such a supplier could provide the heat at a discount, thereby making its apartments more attractive to potential renters. Thus, we see no basis for distinguishing between the business of off-site and on-site sale of geothermal heat. If Klamath can support a factual determination that it sustained injury to either such business, it has standing to pursue a treble-damage claim against the City. We therefore turn to whether a material question of fact as to Klamath's injury remained and thus precluded summary judgment.
 
 
 58
 Some courts have held that potential new entrants into a market may not recover under section 4 because the amount of damage sustained is not sufficiently ascertainable, and thus a plaintiff has not suffered tangible injury to his business or property. See, e.g., Duff v. Kansas City Star Co., 299 F.2d 320, 322-23 (8th Cir.1962). However, we have adopted the view that a party "who has taken substantial demonstrable steps to enter an industry and who is thwarted in that purpose by antitrust violations, has suffered a possible ascertainable loss." Solinger v. A & M Records, Inc., 586 F.2d at 1309. In making the determination whether a plaintiff is a prospective entrant who has taken substantial demonstrable steps, we suggested the "intention and preparedness" test, which focuses on the following four factors:
 
 
 59
 1. The background and experience of plaintiff in his prospective business ....
 
 
 60
 2. Affirmative action on the part of plaintiff to engage in the proposed business ....
 
 
 61
 3. The ability of plaintiff to finance the business and the purchase of equipment and facilities necessary to engage in the business ....
 
 
 62
 4. The consummation of contracts by plaintiff ...
 
 
 63
 Id. at 1309-10 (quoting Waldron v. British Petroleum Co., 231 F.Supp. 72, 81-82 (S.D.N.Y.1964)). See also Hecht v. Pro-Football, Inc., 187 U.S.App.D.C. 73, 570 F.2d 982 (D.C.Cir.1976), cert. denied, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978); Quinonez v. National Association of Securities Dealers, Inc., 540 F.2d 824 (5th Cir.1976).
 
 
 64
 The district judge in this case reviewed the affidavits, exhibits, and depositions before him and concluded that there was no genuine issue as to any material fact relevant to Klamath's preparedness to enter the business of off-site sale of geothermal heat. The district judge stated, "Plaintiffs' steps were exploratory in nature only and, as a matter of law, do not meet the requirements of the Clayton Act." Klamath argues that it had researched the possibility of geothermal development, obtained geothermal water permits from the State of Oregon, contacted various utility companies about the use of the resources for electrical generation, attended a gasohol conference, applied for a United States Department of Energy grant for resource development (which was rejected), developed engineering plans for off-site use, purchased advertisements in the Wall Street Journal for venture capital, and attempted to apply to the City for a utility franchise. Our question is whether this constitutes affirmative action to engage in the business of supplying geothermal heat or rather is properly characterized, as a matter of law, as steps that are exploratory in nature in developing the off-site business. While the four Solinger factors are neither exclusive nor necessarily applicable in every case, we conclude they are adequate for our review of the issue in this case.
 
 
 65
 Applying the first suggested factor, Klamath has little background or experience. Parks testified in his deposition that neither he nor Ansola had any experience in geothermal development. Parks has had no prior economic interest in a geothermal project.
 
 
 66
 As to the second factor, Klamath's affirmative actions are properly described as essentially preliminary. No tests were made by Klamath to determine the potential of its wells--it merely allowed the City to make some tests. Indeed, Parks' admission in his deposition is telling:
 
 
 67
 Q. * * * [W]ould it be fair to summarize that in connection with all of these different uses [of geothermal energy], greenhouse, mushroom, piping it down to downtown structures, the ones that you have described, all of them would only be at the present time in what you might call the exploratory stage?
 
 
 68
 A. Yes.
 
 
 69
 As to the third factor, the record does not demonstrate any measurable assurance that the off-site business will be financed. Finally, there is no evidence of any contracts as identified in the fourth factor. Under these circumstances, we conclude the district judge did not err in holding that there was no material question of fact as to whether Klamath had taken sufficient demonstrable steps for entry into the off-site geothermal heat business to meet the standing requirement.
 
 
 70
 This, however, does not end the responsibility of the district court on this issue. Because the district judge mistakenly excluded the on-site geothermal heat business from consideration, on remand he will need to consider whether Klamath has taken sufficient demonstrable steps to enter that business to establish its standing to sue. The decision for the off-site business does not necessarily require the same conclusion for the on-site business.
 
 
 71
 Since Klamath was already in the market of providing space heating by geothermal power to ten residences on its southern tract, the district judge should consider whether it had the background and experience necessary to provide space heating to the proposed apartment complex in the northern tract. Klamath had obtained an oral commitment for a ten-year loan of $5,060,107 for the financing of the apartment complex. It had applied for and received zoning changes which would permit the apartment complex to be constructed. Indeed, the City has set forth no facts in its brief which could dispute Klamath's claim that had it not been for the denial of Klamath's vacation petition, it would have successfully expanded its on-site geothermal heating business by supplying heat to the 214 apartment units to be built on its northern tract. Thus, it was error for the district judge to find for the City at this stage of the proceedings on this aspect of the standing issue.
 
 
 72
 Because of our holding, we should also discuss the district court's decision that it was clear from the pleadings that Klamath's on-site geothermal heating business was not in any way engaged in interstate commerce. We agree with Klamath that the finding by the district court that its on-site heating activities were local in nature does not resolve the jurisdictional question. As the Supreme Court recently stated in McLain v. Real Estate Board of New Orleans, Inc., 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980):
 
 
 73
 The broad authority of Congress under the Commerce Clause has, of course, long been interpreted to extend beyond activities actually in interstate commerce to reach other activities that, while wholly local in nature, nevertheless substantially affect interstate commerce.
 
 
 74
 Id. at 241, 100 S.Ct. at 508 (emphasis in original) (citations omitted). To establish the jurisdictional element of a Sherman Act violation, a plaintiff must demonstrate that the defendant's activity is itself in interstate commerce or, if it is local in nature, that it "has an effect on some other appreciable activity demonstrably in interstate commerce." Id. at 242, 100 S.Ct. at 509 (citation omitted). To meet this "effect on commerce" test, Klamath need only demonstrate that the City's local activity of establishing and operating a geothermal-heating district would have a substantial effect on interstate commerce, not the "more particularized showing" that the alleged anticompetitive actions against Klamath had a substantial effect on interstate commerce. Id. at 242-43, 100 S.Ct. at 509; Turf Paradise, Inc. v. Arizona Downs, 670 F.2d 813, 818-19 (9th Cir.), cert. denied, 456 U.S. 1011, 102 S.Ct. 2308, 73 L.Ed.2d 1308 (1982). There must be a sufficient nexus between the activity and interstate commerce so that it can be said that "as a practical matter of economics" there is "a not insubstantial effect on the line of commerce involved." Community Builders, Inc. v. City of Phoenix, 652 F.2d 823, 827 (9th Cir.1981).
 
 
 75
 It would be inappropriate on this record to decide whether Klamath has met the jurisdictional requirements of the Sherman Act. The City did not raise this issue in its motion for summary judgment nor was any evidence offered thereon. Klamath argues that the interstate operation of major energy suppliers suggests that a restraint of local competition by the City has effects upon interstate commerce. On remand, it will be necessary for the district court to determine whether there are genuine issues of material fact remaining as to this jurisdictional question and that of whether antitrust violations have occurred, and if not, whether either party is entitled to judgment as a matter of law.
 
 
 76
 B. Standing Under Section 16 of the Clayton Act.
 
 
 77
 Klamath also sought injunctive relief under section 16 of the Clayton Act, 15 U.S.C. Sec. 26 (1976), which provides in part:Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, ... when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, ....
 
 
 78
 We have recognized that the standing requirements of section 16 are broader than those of section 4. State of Hawaii v. Standard Oil Co., 431 F.2d 1282, 1284-85 (9th Cir.1970), aff'd, 405 U.S. 251, 261, 92 S.Ct. 885, 890, 31 L.Ed.2d 184 (1972). The first significant difference is the lack of any mention of "business or property" in section 16. This omission clearly signals different standing requirements under the two sections. See Hawaii v. Standard Oil Co., 405 U.S. 251, 261, 92 S.Ct. 885, 890, 31 L.Ed.2d 184 (1972). As we observed in In re Multidistrict Vehicle Air Pollution, 481 F.2d at 130, broader standing under section 16 is fully justified because of the difference between the remedies available under each section. "In contrast to section 4, section 16 does not involve punitive and potentially disastrous judgments for treble damages and attorneys' fees; neither is there the potential threat of duplicative recoveries." 481 F.2d at 130 (footnote omitted).
 
 
 79
 To demonstrate standing under section 16, a plaintiff must show a threatened loss or injury cognizable in equity proximately resulting from the alleged antitrust violation. City of Rohnert Park v. Harris, 601 F.2d 1040, 1044 (9th Cir.1979), cert. denied, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980). In the present case, the district court stated:
 
 
 80
 Insofar as the plaintiffs allege injury to their business, they have not met the Rohnert test. They failed to show that but for the alleged anticompetitive activity by the City, they would have been competitors in the market for geothermal heating. As noted above, they were unprepared for entry into the market, and such entry depended upon a number of factors other than the defendants' actions.
 
 
 81
 (emphasis in original). We infer from this statement that the district judge restricted his inquiry into causation to loss or injury in Klamath's off-site heating business. By so doing, however, the district judge required Klamath's injury to be within the "target area" of the alleged anticompetitive conduct, an element which is not required under section 16.
 
 
 82
 It is clear from our decisions that the "target area" approach is irrelevant to the question of standing under section 16. City of Rohnert Park v. Harris, 601 F.2d at 1044; In re Multidistrict Vehicle Air Pollution, 481 F.2d at 130-31. As the district court recently stated in Los Angeles Memorial Coliseum Commission v. National Football League, 468 F.Supp. 154, 160 (C.D.Cal.1979), "the very thing that prompted this Circuit to adopt the target area approach--the availability of treble damages under Sec. 4--is absent from a suit for injunctive relief under Sec. 16." Thus, it was improper for the district court to conclude that because Klamath was unprepared to enter the off-site geothermal market, it failed to establish standing under section 16. If, as the record on appeal appears to indicate, Klamath has demonstrated the requisite injury (here to its residential housing business) proximately resulting from the denial of its vacation petition allegedly in violation of the antitrust laws, it would have standing to assert a claim under section 16. However, the district judge has not passed upon this factual inquiry and, upon remand, he will have the opportunity to do so. Our opinion goes no further than the issue of standing and we express no opinion as to the merits of Klamath's antitrust claim.
 
 VI.
 Antitrust Immunity
 
 83
 The City argues that even if the district court erred in concluding that Klamath lacked standing, the judgment should be affirmed on the ground that the City is immune from antitrust liability under the "state action" exemption of Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). In Parker, the Supreme Court observed that immunity for state regulatory programs is grounded in our federal structure. "In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." Id. at 351, 63 S.Ct. at 313. The Court found nothing in the language of the Sherman Act or its history which suggested that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. Id.
 
 
 84
 In City of Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978) (plurality opinion), the Supreme Court considered the availability of this immunity to a state's municipalities. The plurality construed earlier precedent as holding that the Parker exemption reflects the federalism principle that we are a nation of states and that a state's subdivisions generally are not treated as equivalents to states. "In light of the serious economic dislocation which could result if cities were free to place their own parochial interest above the Nation's economic goals reflected in the antitrust laws, ... we are especially unwilling to presume that Congress intended to exclude anticompetitive municipal action from their reach." Id. at 412-13, 98 S.Ct. at 1136-37. Accord, Community Communications Co. v. City of Boulder, 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982).
 
 
 85
 It was emphasized in Lafayette, however, that if anticompetitive conduct by a municipality was engaged in "pursuant to state policy to displace competition with regulation or monopoly public service," 435 U.S. at 413, 98 S.Ct. at 1137, the Parker doctrine would provide a shield from liability. The plurality opinion stressed that the challenged restraint on competition must be one "clearly articulated and affirmatively expressed as state policy." Id. at 410, 98 S.Ct. at 1135. This standard has since been adopted by a majority of the Court. California Retail Liquor Dealers Association v. Midcal Aluminum, Inc., 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980).
 
 
 86
 The City argues that it is apparent from an analysis of Chapter 523 of the Oregon Revised Statutes, Or.Rev.Stat. Secs. 523.010-.710 (1981), in which the state authorizes public ownership of geothermal resources, that the Oregon legislature "envisioned each separate [geothermal heating] district as constituting a 'little monopoly.' " From our reading of the statute, it is questionable whether the legislature intended to create such monopolistic control by the City. Nowhere in the statute is there any express authorization to exclude private competition in the geothermal market. However, even assuming that such a monopoly proviso is implicitly authorized and can be said to be "clearly articulated and affirmatively expressed as state policy," Lafayette, 435 U.S. at 410, 98 S.Ct. at 1135, the Oregon statute would not immunize the anticompetitive conduct complained of by Klamath.
 
 
 87
 The acts complained of are those allegedly committed by the City prior to the formation of a geothermal heating district. Klamath argues persuasively that merely demonstrating a state policy to displace competition with monopoly public service does not necessarily satisfy the additional requirement that the legislature contemplate the kind of action complained of. See id. at 415, 98 S.Ct. at 1138. For example, merely because the state may authorize a city to be the sole supplier of a natural resource and to set prices for that resource, it does not necessarily follow that the city is immunized from antitrust liability when it attempts to tie the purchase of a non-monopolized product or service to the sale of that natural resource. As the plurality stated in Lafayette, "even a lawful monopolist may be subject to antitrust restraints when it seeks to extend or exploit its monopoly in a manner not contemplated by its authorization." 435 U.S. at 417, 98 S.Ct. at 1138-39; see Otter Tail Power Co. v. United States, 410 U.S. 366, 377-82, 390-91 & n. 7, 93 S.Ct. 1022, 1029-32, 1035-36 & n. 7, 35 L.Ed.2d 359 (1973) (Stewart, J., concurring in part and dissenting in part).
 
 
 88
 There is nothing in Chapter 523 which would allow us to infer that any authorization by the state to displace competition with city-run geothermal districts also includes authorization for a city to undertake anticompetitive actions in its efforts to establish such a district. We cannot say that there is a "clearly articulated and affirmatively expressed" state policy that there be no competition in the geothermal heat market prior to the formation of such city-run geothermal heating districts. To the contrary, at the time of the alleged anticompetitive acts, the City's charter did not empower it to form a geothermal heating district. In fact, the electorate of Klamath Falls had voted not to form such a district in a prior referendum. Or.Rev.Stat. Sec. 523.020(1) (1981) authorizes a city to form a geothermal heating district only "when empowered by its charter to do so ...".
 
 
 89
 The City argues that in enacting Chapter 523, the Oregon legislature made a considered determination that the benefits of private competition in the development of geothermal resources were outweighed by the need for public control of those resources. We need not reach that question because it is untenable that the legislature contemplated restraints on private enterprise until there was adequate assurance that public control of the resource, and the benefits which accompany public control, would be forthcoming.
 
 
 90
 We therefore find that the City's actions were not exempt under the state action doctrine.
 
 VII.
 
 91
 Appeal of District Court's Denial of Attorneys' Fees
 
 
 92
 The district court declined to award attorneys' fees to the City under 42 U.S.C. Sec. 1988 (1976), which provides that in certain civil rights actions, including section 1983 cases, the district court may, in its discretion, award "the prevailing party" reasonable attorneys' fees. While we have reversed the summary judgment granted to the City, the same issue may come before the court again if the City should prevail on the trial of the various factual issues. Without implying how those issues will be resolved, we shall address the City's appeal because it has been fully briefed and argued. In Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978), the Supreme Court concluded that attorneys' fees may be awarded to a prevailing defendant in an action brought pursuant to Title VII of the Civil Rights Act of 1964, without a showing of subjective bad faith, where the action is "frivolous, unreasonable, or without foundation." Id. at 421, 98 S.Ct. at 700; see Roadway Express, Inc. v. Piper, 447 U.S. 752, 762, 100 S.Ct. 2455, 2462, 65 L.Ed.2d 488 (1980). The Court has applied this standard to section 1988. Hughes v. Rowe, 449 U.S. 5, 14-16, 101 S.Ct. 173, 178-79, 66 L.Ed.2d 163 (1980) (per curiam).
 
 
 93
 The district court's decision not to award attorneys' fees to the City will be disturbed only if the district judge abused his discretion. O'Neil v. City of Lake Oswego, 642 F.2d 367, 370 (9th Cir.1981). We conclude that Klamath's claims were not frivolous, unreasonable, or without foundation. Each claim involved complex constitutional questions which were not easily resolved. The district court did not abuse its discretion in denying the City's motion for attorneys' fees.
 
 
 94
 The City also contends that the standard articulated in Christiansburg and Roadway Express should not be applied in this case. Essentially it argues that because Klamath, unlike most civil rights litigants, has considerable financial resources, it will not be deterred from litigating a meritorious claim because of the threat of liability for attorneys' fees. Thus, the City argues, attorneys' fees should be granted solely because it prevailed. However, not only has the City failed to cite any authority to support such a distinction, but the rule it suggests would be contrary to the purpose of section 1988. Congress intended section 1988 to encourage non-frivolous suits by victims of discrimination. S.Rep. No. 1011, 94th Cong., 2d Sess. 5, reprinted in 1976 U.S.Code Cong. & Ad.News 5908, 5912; Roadway Express, Inc. v. Piper, 447 U.S. at 762, 100 S.Ct. at 2462. It does not necessarily follow that merely because a party may have greater resources with which to pay for attorneys' fees, their possible imposition will not make the party more reticent to vindicate its civil rights. It would be impossible for a court to determine at what point a plaintiff's financial resources are large enough that the imposition of attorneys' fees becomes a trivial concern. Only Congress should make such a determination.
 
 
 95
 AFFIRMED in part, REVERSED and REMANDED in part.
 
 
 96
 WALLACE, Circuit Judge, concurring in part and dissenting in part:
 
 
 97
 I concur in parts V and VI, in which the majority reverses the district court's grant of summary judgment on Klamath's antitrust claims. In my view, the majority improperly reaches out in part VII to provide an advisory opinion on the propriety of the district court's denial of attorneys' fees. Because the majority reverses the district court's summary judgment, the issue of attorneys' fees is no longer relevant to this appeal. I dissent from parts II, III, and IV, in which the majority reverses the district court's dismissal of Klamath's section 1983 claims. Klamath has failed to state a claim under the taking clause of the fifth amendment, the equal protection clause, or the due process clause.
 
 
 98
 * Klamath's claim based on the taking clause and the unconstitutional conditions doctrine fails under Honolulu Rapid Transit Co. v. Dolim, 459 F.2d 551 (9th Cir.), cert. denied, 409 U.S. 875 (1972) (Honolulu ). We held there that the unconstitutional conditions doctrine is not implicated when a governmental body and a private party negotiate the price to be paid for an exchange of property between the two, even though under the contract the government pays less than "just compensation" for the property. The reasoning for our holding is clearly set out in the passage quoted by the majority. Maj. op., at 651. When the government bargains over compensation for its own property, it is free to bargain aggressively with "due regard to [its] own interest." Id. at 553, quoting Albrecht v. United States, 329 U.S. 599, 604, 67 S.Ct. 606, 609, 91 L.Ed. 532 (1947). Under such circumstances, there is no taking by the government; the transaction passes "out of the range of the Fifth Amendment." Honolulu, 459 F.2d at 553, quoting Albrecht v. United States, 329 U.S. at 603, 67 S.Ct. at 608. As a result, no constitutional right has been relinquished and the unconstitutional conditions doctrine is not implicated.
 
 
 99
 Here, pursuant to its charter, the City has bargained aggressively to obtain compensation for its real property. As was the case in Honolulu, the City has conditioned the grant of a public benefit (street vacation) on Klamath's agreement to contractual terms that Klamath alleges would allow the City to obtain its property without paying just compensation. Since Honolulu holds that a contract is constitutional even though it allegedly results in the government obtaining private property without paying just compensation, we cannot now hold that the government's attempt to negotiate such a contract is impermissible. If the former does not constitute an unconstitutional taking, a fortiori the latter cannot.
 
 
 100
 The majority attempts to distinguish Honolulu by stating that in that case the imposed condition was directly related to the subject of the benefit and that in this case the condition is not directly related. The majority concludes that a condition requiring an applicant for a governmental benefit to forego a constitutional right is permissible if the condition is rationally related to the benefit conferred. The majority's unprecedented distinction distorts both our holding in Honolulu and the unconstitutional conditions doctrine.
 
 
 101
 The majority relies especially on Frost & Frost Trucking Co. v. Railroad Commission, 271 U.S. 583, 46 S.Ct. 605, 70 L.Ed. 1101 (1926) (Frost ). In Frost, the Supreme Court struck down a state economic regulation which in effect required private carriers to become public carriers in order to use the public highways. Frost, 271 U.S. at 592-94, 46 S.Ct. at 606-07. Under prior Supreme Court precedent, requiring a private carrier to become a public carrier constituted a taking in violation of the fifth amendment. Id. at 592, 46 S.Ct. at 607; accord Michigan Public Utilities Commission v. Duke, 266 U.S. 570, 577-78, 45 S.Ct. 191, 193-94, 69 L.Ed. 445 (1925). In striking down the statute, the Court stated that the government may not impose conditions upon its grant of a privilege which require the relinquishment of constitutional rights. 271 U.S. at 593-94, 46 S.Ct. at 607. In Honolulu, after quoting extensively from Frost, we distinguished that case, not because we found a relationship between the benefit conferred and the condition imposed, but because we found that no taking had occurred. In fact, neither Frost nor Honolulu contains any analysis of the relation between condition and benefit.
 
 
 102
 The majority's reliance on Stephenson v. Binford, 287 U.S. 251, 53 S.Ct. 181, 77 L.Ed. 288 (1932) (Stephenson ), also is misplaced. In quoting from Frost and Stephenson, see maj. op., at 652-653, the majority confuses unconstitutional conditions analysis with analysis of whether an economic regulation furthers a legitimate state interest. In upholding the state regulation in Stephenson, the Court first distinguished Frost by finding that the statute before the Court in Stephenson did not convert private carriers into common carriers; hence, no taking was involved. Id. at 265-68, 53 S.Ct. at 184-85. The Court later analyzed whether the state had asserted a legitimate state interest and whether the imposed condition was rationally related to that interest. Id. at 272-76, 53 S.Ct. at 187-89. Because Stephenson, like Frost, was decided in the era of economic substantive due process, the state was required to demonstrate that its regulation advanced a legitimate state interest; if it did not, the regulation violated the due process clause by interfering with private contractual relations. Id. at 263, 274, 53 S.Ct. at 184, 188. The Court in Stephenson stated that the statute involved in Frost was not designed to regulate the public highways, a legitimate state purpose, but to "protect the business of those who were common carriers in fact by controlling competitive conditions," id. at 275, 53 S.Ct. at 188, then considered an illegitimate state purpose. Thus, the Court in Stephenson interpreted the statute in Frost as advancing only an impermissible state interest.
 
 
 103
 Even assuming this means/ends analysis is still sound today, it cannot be argued that the City's interest in developing geothermal power is an impermissible governmental interest or that its requirement that Klamath give up wells in exchange for a street vacation is not rationally related to that interest. Moreover, by requiring a further nexus between the condition and the benefit, the majority goes beyond Frost and Stephenson and seeks to force the City to "compartmentalize" its legitimate state interests.
 
 
 104
 United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940), on which the majority also relies for its proposed distinction, is not relevant for the same reason. In that case, federal statutory and licensing provisions regarding a hydroelectric dam were challenged as violative of both the commerce clause and the taking clause of the fifth amendment. Id. at 421, 61 S.Ct. at 305. In separate analyses, the Court found (1) that the license conditions were related to the federal commerce power, and (2) that the conditions did not violate the fifth amendment. Id. at 426-28, 61 S.Ct. at 308-09. The majority mixes the two analyses together in an attempt to justify its conclusion that the government can require relinquishment of a constitutional right provided its imposed condition is related to the benefit withheld.
 
 
 105
 The weakness of the majority's proposed distinction is demonstrated by the facts of this case. The majority states that the City is free to bargain aggressively. Maj. op., at 652. Indeed, it apparently condones the City's charging Klamath over two and a half times the amount it ordinarily charges for street vacation. Thus, under the majority's analysis, the City could have charged Klamath enough money for the street vacation that it could then have condemned Klamath's wells and still had money left over. Its mistake was requesting that Klamath pay for the street vacation with its wells rather than with money. This reasoning turns upside down the unconstitutional conditions doctrine which is designed to prevent the government from doing indirectly what it cannot do directly. See Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972); Frost, 271 U.S. at 592-93, 46 S.Ct. at 606-07.
 
 
 106
 Likewise, the majority would apparently uphold a contract in which the City required, in exchange for the street vacation, that Klamath construct street lights or finance some other project connected with streets, even though such obligations would require expenditures for the City's benefit. It will not, however, allow the City to seek to acquire the wells in exchange for the street vacation. This distinction is meaningless; in either case, the government uses the same leverage to coerce concessions from the private party. Under Honolulu such "coercion" is permissible because it is not based on the government's power to take, but on its role as a market participant. The City is given the same prerogatives as any other party to bargain aggressively; to hold otherwise would restrict the government's ability to bargain for exchanges of property. Honolulu, 459 F.2d at 553. Thus, the majority's analogies to a government's withholding parking permits or business licenses to exact concessions are inapposite because those are not areas in which the City bargains for compensation.
 
 
 107
 It may be argued that because of its inherently superior bargaining power a governmental body should not be given such wide latitude when bargaining over compensation for its property. Nevertheless, this argument is rejected by our holding in Honolulu and we are bound by this prior precedent. Because I cannot find an adequate distinction between Honolulu and the case before us, I find that Klamath has failed to state a cause of action under the taking clause of the fifth amendment.
 
 II
 
 108
 Klamath also fails to establish its claim under the equal protection clause. Since this case involves neither a suspect classification nor the infringement of a fundamental right, the City need only demonstrate that its discriminatory treatment of Klamath bears a rational relationship to a legitimate governmental purpose. San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 40, 93 S.Ct. 1278, 1300, 36 L.Ed.2d 16 (1973); Ybarra v. Town of Los Altos Hills, 503 F.2d 250, 254 (9th Cir.1974).
 
 
 109
 The City submits as a legitimate governmental purpose its desire to acquire Klamath's geothermal wells for the City's proposed geothermal heating district. Klamath admits that its wells are located within the City's planned geothermal district and that the City's ultimate goal in conditioning the street vacation on the dedication of the well site was to acquire the wells for the public. These concessions preclude our holding that the vacation denial violated the equal protection clause. The acquisition of Klamath's well sites for a city-run geothermal heating district constitutes a legitimate state interest. The only additional inquiry is whether the City's vacation denial was rationally related to the accomplishment of that regulatory purpose. It is clear from the record that the City conditioned the vacation approval and ultimately denied the request in order to acquire Klamath's geothermal drilling rights for the public. Thus, its actions were rationally related to a legitimate state interest.
 
 
 110
 It is unclear why the majority rejects this reasoning. It apparently concludes that not only must the City's discriminatory conduct be rationally related to a legitimate government interest, but that the asserted interest also must be related to the statute pursuant to which the City acts. In other words, the City's discriminatory granting of street vacations can only be justified by its interest in street vacation. I see no reason to add this prong to the equal protection test or to force the City to compartmentalize its interests. We may only inquire whether the proffered interest is legitimate and whether the discrimination advances that interest. Otherwise, we begin to act as a super legislature, judging the wisdom of economic policy determinations. See City of New Orleans v. Dukes, 427 U.S. 297, 303-04, 96 S.Ct. 2513, 2516-17, 49 L.Ed.2d 511 (1976) (per curiam) ("[I]n the local economic sphere, it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment."). In this case, for example, the majority's reasoning would essentially require the City to treat all applicants for street vacation permits equally, restricting the City's ability to bargain over the price for the vacation of its streets.
 
 
 111
 The cases cited by the majority do not substantiate its expansion of the equal protection test. In both Plyler v. Doe, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), and Zobel v. Williams, 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982), for example, the Court struck down a state statute which was discriminatory on its face because the discrimination did not further the government's asserted purpose for passing the statute. Plyler v. Doe, 457 U.S. at 226-30, 102 S.Ct. at 2400-02; Zobel v. Williams, 457 U.S. at 61-64, 102 S.Ct. at 2313-15. Here, however, the statute pursuant to which the City acts is neutral on its face and its constitutionality is not being challenged. The state action Klamath challenges is the City's discriminatory conduct in carrying out the statute. The City must justify this action by demonstrating that it furthers its alleged interest, Plyler v. Doe, 457 U.S. at 215-16, 102 S.Ct. at 2394, and clearly it has done so in this case. None of the cases cited by the majority supports a requirement that the City's legitimate interest be related to the statute whose constitutionality is not even disputed.
 
 
 112
 The majority admits that its conclusion on the equal protection issue is largely dependent on its resolution of the fifth amendment issue. See maj. op., at 654. Only if the attempt to obtain the wells is viewed as an impermissible government activity can Klamath sustain its argument that the City has engaged in impermissible discrimination. Since I find that no taking has occurred and the City has not violated the fifth amendment as incorporated by the fourteenth amendment in seeking to acquire Klamath's wells, I also find that Klamath fails to state a claim under the equal protection clause.
 
 III
 
 113
 Klamath likewise fails to establish a section 1983 action based on a violation of the due process clause. Klamath asserts that Or.Rev.Stat. Sec. 271.100 (1981) confers upon it a property interest protectable by the due process clause. The majority is correct that this issue is controlled by Jacobson v. Hannifin, 627 F.2d 177 (9th Cir.1980). The question before us is whether the procedural requirements of the Oregon statute were intended to operate as a "significant substantive restriction" on the City's actions, that is, whether they enhance Klamath's "expectation of obtaining a [street vacation] to a degree sufficient to create a protectible [sic] interest." Id. at 180.
 
 
 114
 The procedural guarantee of a formal hearing does not significantly enhance Klamath's expectation of obtaining the requested street vacations. The City Council has the statutory authority to grant or deny a vacation petition depending upon whether it finds that "the public interest will be prejudiced by the vacation." Or.Rev.Stat. Sec. 271.120 (1981). The statute does not limit the substantive grounds upon which the City Council is to make this determination, and gives no assurance, conditional or otherwise, that a vacation petition will be granted. There is no measurable difference between the grant of authority to the Gaming Commission in Jacobson and that involved here: both vest the governing body with sufficient discretion to negate any claim that the state intended to create a protectable interest. In both cases, the mere fact that the state also provided for certain procedural requirements, such as a public hearing, does not change this conclusion. I cannot agree with the majority that the requirement that the City base its vacation decisions on "the public interest" places "significant substantive restrictions on the agency's actions so as to confer due process rights."
 
 
 
 [1]
 Examples of such interests are control of traffic, pollution or access
 
 
 [2]
 Klamath states in its opening brief that this is the only instance in which the City has ever demanded real property in exchange for vacation. The City does not dispute this allegation
 
 
 [3]
 The prohibition against unconstitutional conditions is somewhat analogous to the per se rule against "tying" in the antitrust laws. See, e.g., Siegel v. Chicken Delight, Inc., 448 F.2d 43, 47 (9th Cir.1971), cert. denied, 405 U.S. 955, 92 S.Ct. 1173, 31 L.Ed.2d 232 (1972). Both rules are designed to deter a party from unfairly using its dominant position in one area to compel acquiescence in a separate area
 
 
 [4]
 The City argues that the City Council was concerned because Klamath refused to submit conceptual drawings of the street realignment in the proposed development. However, Klamath insists that it had twice submitted conceptual drawings to the City and that in a December 21, 1978 agreement, the City retained the power to approve the location of the streets. Thus, there remains a material issue of fact as to whether the vacation denial was reasonably related to the lack of conceptual drawings
 As to the second proposed rational relationship, the City points to the concern expressed at several City Council meetings over public access to the property. However, it was earlier determined in the City's zoning decision that traffic conditions would be enhanced by the development. Indeed, it appears from a May 31, 1979 letter from Klamath to the City, that Klamath had agreed to give the City a street easement for the strip of property which the City sought for dedication. Thus, there is a question of fact as to whether the vacation denial was rationally related to a traffic purpose.
 
 
 [5]
 We do not contend that a city may not agree to take property of equivalent value in exchange for conveying a benefit, even though the property is unrelated to the benefit sought. If agreement cannot be obtained, however, we believe that the city must set a monetary value on the benefit and allow the applicant to pay for it rather than comply with a condition unrelated to the benefit sought
 
 
 [6]
 Klamath contends that the zoning change agreement obligated it to construct $250,000 worth of improvements in and around the parcel, which would be unreasonable unless the streets were vacated so that the project could proceed