**MERCY–PENINSULA AMBULANCE, INC., Plaintiff,**

v.

**COUNTY OF SAN MATEO; Medevac, Inc.; 911 Emergency Services, a California corporation; Med 21—Delaware Corp.; Mills Hospital; Peninsula Hospital and Sequoia Hospital, Defendants.**

No. C–84–1184–WWS.

United States District Court, N.D. California.

Aug. 8, 1984.

Roderick G. Dorman, Barry P. Jablon, Jeffrey D. Masters, Cox, Castle & Nicholson, Los Angeles, Cal., for plaintiff.

Fredric C. Nelson, Wynne S. Carvill, Robert M. Halperin, John R. Foote, Thelen, Marrin, Johnson & Bridges, Michael Bradley, Murphy, Pearson, Bradley & Beattie, San Francisco, Cal., Barry C. Marsh, Ropers, Majeski, Kohn, Bentley, Wagner & Kane, Redwood City, Cal., William J. Meeske, Michael J. Shockro, Lathan & Watkins, Los Angeles, Cal., Russell B. Carpenter, Carpenter, Higgins & Simonds, Burlingame, Cal., Rochelle D. Alpert, Morrison & Foerster, John P. McGlynn, Daniel J. Meagher, Jr., McGlynn, McLorg & McDowell, San Francisco, Cal., Gerard Wagstaffe, Wagstaffe, Daba & Hulse, Redwood City, Cal., for defendants.

## MEMORANDUM OF OPINION AND ORDER

SCHWARZER, District Judge.

This antitrust action concerns the provision by ambulance personnel of paramedic

service, the highest level of pre-hospital emergency medical care, in the defendant County of San Mateo ("the County"). Defendants Medevac, Inc. ("Medevac") and 911 Emergency Services, Inc. ("911") provide primary emergency ambulance service for the County and defendant hospitals [1] through the County's public dispatch lines; plaintiff provides "back-up" service when the primary providers cannot respond to a call. The gravamen of plaintiff's complaint is that the County, in conspiracy with the other defendants, has refused to certify as paramedics any ambulance personnel other than that employed by the primary providers Medevac and 911. Plaintiff alleges that defendants' actions constitute a concerted refusal to deal in violation of § 1 of the Sherman Act and an exercise of monopoly power in violation of § 2; it seeks damages and injunctive relief.

Each of the defendants has moved to dismiss under Rule 12(b)(6). They contend that they are immune from antitrust liability under the "state action" doctrine of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), arguing that the actions challenged by plaintiff were taken by the County pursuant to an express state policy to displace competition with regulation of paramedic care. They also argue that they are immune under the *Noerr-Pennington* doctrine which shields from antitrust scrutiny attempts to influence government officials' decision-making. Finally, the County claims that it is protected by the Tenth Amendment from antitrust liability for the conduct alleged.

Plaintiff responds that defendants have failed to identify an express state policy to displace competition in the paramedic service market in the manner employed by the County. It also argues that *Noerr-Pennington* does not apply where government officials are alleged to have conspired with private defendants and that imposing liability on the County would not regulate the

"state as state" in violation of the Tenth Amendment.

### A. *Statutory Background.*

A complex web of statutory provisions governs emergency medical and paramedic services in California since 1980, the period in which plaintiff alleges the anticompetitive acts to have taken place.

The earliest act is the Wedworth-Townsend Paramedic Act ("WTPA"), Cal.Health & Saf.Code §§ 1480–1485, enacted in 1970, which authorized counties to "conduct a pilot program" for use of mobile intensive care paramedics to deliver pre-hospital emergency care, *id.* § 1480. The Act provided for county training and certification of paramedics, id. §§ 1481(a), 1481.3, as well as county establishment of recertification criteria, *id.* § 1484.2, and enumerated minimum training standards for paramedics, § 1482. It also authorized counties to "contract with a general acute care hospital which has the approval of the county health officer to participate in the pilot program," *id.* § 1482. Although the WTPA was originally to expire by its terms in 1979, *id.* § 1484, it was extended by amendment until 1982, Cal.Stats.1979, C. 555, p. 1764, § 1.

In 1980, the Emergency Medical Services and Emergency Medical Care Personnel Act ("EMS Act"), *id.* §§ 1797 *et seq.*, was adopted to replace the repealed Emergency Medical Care Services Act, *id.* 1750 *et seq.* The EMS Act, which took effect in 1981, seeks to "provide the state with a statewide system for emergency medical services by establishing within the Health and Welfare Agency the Emergency Medical Authority which is responsible for the coordination and integration of all state activities concerning emergency medical services," *id.* § 1797.1. That state Authority is empowered to, among other things, review the emergency requirements of local "EMS areas," *id.* § 1797.102, and to establish standards for paramedics (EMT-P's) and

---

1. Defendants Seton Medical Center and Mills Memorial Hospital are private hospitals, and defendants Peninsula Hospital and Medical Cen-ter and Sequoia Hospital are public hospital districts.

lower level emergency personnel (EMT–I's and EMT–II's), *id.* §§ 1797.80–84, 1797.-170–172, 1797.176.

The Act also envisions local regulation. It authorizes counties to designate a local "EMS agency" which may "plan, implement and evaluate an emergency medical services system in accordance with the provisions of this part, consisting of an organized pattern of readiness and response services based on public and private agreements and operational procedures," *id.* § 1797.204. With regard to the certification of paramedical and other personnel in counties which create such systems, the Act provided until 1983:[2]

1797.206. The county is responsible for implementation of advanced life support systems and limited advanced life support systems and for the monitoring of training programs.

1797.208. The county shall be responsible for determining that the operation of training programs at the EMT–I, EMT–II, and EMT–P levels are in compliance with this part, and shall approve the training programs if they are found to be in compliance with this part. The training program at the California Highway Patrol Academy shall be exempt from the provisions of this section.

1797.210. The county health officer or county designated physician shall issue a certificate to an individual upon proof of satisfactory completion of an approved training program and passage of the examination for competence. The certificate shall be proof of the individual's initial competence to perform at the designated level. The county health officer or county designated physician shall re-certify EMT–I's, EMT–II's, and EMT–P's through passage of an examination for competency at least every two years.

1797.212. The county may establish a schedule of fees for certification in an amount sufficient to cover the reasonable cost of administering the certification provisions of this part.

The Act also provides that:

No person or organization shall provide advanced life support or limited advanced life support unless that person or organization is an authorized part of the emergency medical services system of the local EMS agency or of a pilot program operated pursuant to the Wedworth-Townsend Paramedic Act.

*Id.* § 1797.178 (citation omitted).

Finally, § 1797.250 authorizes local EMS agencies to develop an emergency medical services plan which must be submitted for approval by the state Authority:

After July 1, 1982, a local EMS agency may implement a local plan developed pursuant to Section 1797.250 unless the authority determines such plan does not effectively meet the needs of residents and is not consistent with coordinating activities in the geographical area served.

*Id.* § 1797.105(b).

In 1982, the WTPA, parts of which had been incorporated in the EMS Act, *see, e.g.,* §§ 1797.172, 1797.178, was amended for purposes of coordination with the EMS Act. "Paramedic" was redefined in § 1480 in accordance with the minimum standards for EMT–P's, and the EMS Act's provisions for paramedic training and certification maintenance were adopted, § 1484.2.

Although it is difficult to decipher the interrelationship of the two acts, the EMS Act apparently regulated paramedic certification by counties which had adopted an emergency medical services system, while the WTPA continued to regulate certification elsewhere; both acts employed virtually identical standards, and the WTPA was repealed in its entirety in 1984.

### B. *Factual Allegations.*

On defendants' motion to dismiss, plaintiff's allegations are taken as true, *Mark v. Groff,* 521 F.2d 1376, 1377 (9th Cir.1975).

Since at least 1976, defendant County has received calls for emergency ambulance assistance through its public dispatch

---

**2.** The provisions underwent minor amendment in 1983.

and telephone system and has contracted with private ambulance companies to respond to those calls. Alternatively, ambulance service may be arranged for directly between private companies and individual hospitals, physicians, or patients.

Some time before 1980, the County also began to conduct a "pilot program" for mobile intensive care paramedics under the WTPA. Pursuant to that program, the County established procedures to certify qualified ambulance personnel to perform paramedic services under the supervision of an "acute care hospital" within the meaning of Cal.Health & Saf.Code § 1480.

Following a competitive bidding process, the County contracted with defendant Medevac in 1976 to provide primary emergency ambulance service and with plaintiff to provide "back-up" service whenever Medevac could not respond to a call. In 1980, the County and Medevac negotiated a new agreement which continued Medevac's role as primary provider of emergency ambulance service and required that all Medevac personnel be county-certified paramedics as part of the WTPA program. In addition, the contract provided for the County to pay Medevac a set fee for the contract period and for Medevac to collect directly from private patients specified fees which would be shared in part with the County.

Plaintiff alleges that Medevac and the County also entered into an unwritten agreement to ensure that the County would certify only Medevac's personnel to perform paramedic services. Plaintiff, which continued to provide emergency ambulance service to the County in a "back-up" capacity as well as to private persons and physi-

cians who called it directly, requested paramedic certification for its personnel in 1980. The County refused, explaining that it chose to certify only employees of its primary provider, Medevac.

In 1982, the County created an EMS system pursuant to the EMS Act, *id.* § 1797.-200. Although a "local EMS agency" was not formally designated until 1983, the County contracted with three defendant hospitals to provide emergency ambulance service in one area of the County and with the fourth defendant hospital to provide service in the remaining area of the County.[3] The first three hospitals subcontracted with defendant 911 to provide primary emergency medical service, and the fourth subcontracted with Medevac. The 1982 agreements, which are still in effect, track the terms of the County's 1980 agreement with Medevac, and all defendants are alleged to have conspired to continue the County's policy of certifying only primary providers' personnel to be paramedics.

In 1983, the County claimed to change its policy and to agree to certify paramedics not employed by its primary providers. Plaintiff has sought on numerous occasions to have its employees certified but alleges that the County has unnecessarily delayed, has applied certification standards in a discriminatory fashion, and has failed to develop hospital supervisory capacity for additional paramedics as it promised to do.

Plaintiff does not challenge the award to defendants 911 and Medevac of the primary provider contracts.[4] Rather, it charges a conspiracy among the defendants to prevent the County from certifying

3. Plaintiff argues that the County designated itself an EMS agency pursuant to the EMS Act's provisions only in March 1983 and that the EMS plan submitted to the state Authority pursuant to § 1797.250 has not yet been approved. Defendants correctly respond that the EMS Act differentiates between EMS plans which must be submitted for state approval and EMS systems which may be independently implemented by counties. They point to the detailed EMS system set forth in the County's 1982 solicitation for contract bids, developed pursuant to the EMS Act's standards, and argue that the Board's designation of the County as an EMS local agen-

cy in 1983 was a mere formality which did not prevent the EMS system from taking effect. That argument is well-taken in light of the absence in § 1797.200 of any procedural requirements for Agency designation.

4. In its original complaint, plaintiff did challenge the award of the primary provider contracts. Plaintiff amended its complaint to drop that claim, however, in light of information it uncovered early in the litigation regarding defects in its primary provider contract bid.

its paramedics, to inflate the prices charged patients for paramedic services, and to ensure that all emergency calls are received through the County's public dispatch line. Plaintiff claims that the County joined this conspiracy to maintain paramedic fees at a high level and to share in the higher revenue consequently collected by the primary providers. As a result, plaintiff alleges, it has been prevented from delivering paramedic services when it responds to emergency calls either from the County dispatcher in its "back-up" capacity or directly from patients and doctors. It also claims that it has been prevented from developing the paramedic capacity necessary to compete for future primary provider contracts. It seeks treble damages and an injunction restraining defendants from continuing the alleged anticompetitive conspiracy. Defendants have moved to dismiss the complaint.

### C. *State Action Immunity for Local Governments.*

Defendants argue that the County's paramedic certification policy is immune from antitrust liability under the *Parker* state action exemption which holds that federal antitrust laws do not apply to a restraint of trade imposed "as an act of government" by the state "as sovereign," 317 U.S. at 352, 63 S.Ct. at 314. In *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), the plurality opinion held that the *Parker* exemption applies to local governments but only when they act "pursuant to state policy to displace competition with regulation or monopoly public service," *id.* at 413, 98 S.Ct. at 1136. The state policy, the Court went on to say, must be "clearly articulated and affirmatively expressed," *id.* at 410, 98 S.Ct. at 1135.

More recently in *Community Communications Co., Inc. v. City of Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982), a majority of the Court adopted *Lafayette's* standard and held that a state's general grant to a city of "home rule" authority in local and municipal matters did

not suffice to immunize the city's cable television regulation: the state's "mere neutrality respecting the municipal action challenged as anticompetitive" did not satisfy the requirement of a clearly articulated and affirmatively expressed policy, 455 U.S. at 55, 102 S.Ct. at 842–43.

In *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980), an antitrust action against private defendants who claimed to have acted pursuant to state authority, the Court had held that immunity was available only upon proof of both a clear state policy *and* active state supervision of the challenged conduct. In *Boulder,* the Court questioned, however, whether the state supervision requirement applied to local government defendants as opposed to private parties. 455 U.S. at 51–52 n. 14, 102 S.Ct. at 841 n. 14. The Ninth Circuit has recently followed a number of other circuits in deciding that it does not, as long as the city's challenged conduct is a traditional municipal function, *Golden State Transit Corp. v. City of Los Angeles,* 726 F.2d 1430, 1434 (1984:

> [a] requirement of active state supervision would erode local autonomy. It makes little sense to require a state to invest its limited resources in supervisory functions that are best left to municipalities.

*Golden State Transit,* relying in part on *Parks v. Watson,* 716 F.2d 646, 663 (9th Cir.1983), also held that to satisfy *Lafayette's* clear state policy requirement, a political subdivision

> must demonstrate not only the existence of a state policy to displace competition with regulation, but also that the legislature contemplated the kind of actions alleged to be anticompetitive.

726 F.2d at 1433. The Court found there that defendant city's refusal to grant plaintiff a taxicab franchise was immune under *Lafayette* because the state constitution and a taxicab licensing statute evidenced a state policy to "displace competition with

regulation in the taxicab industry," *id.* at 1434.

In *Parks*, on the other hand, the Court found no immunity for defendant city's alleged attempt to monopolize the geothermal heating market by refusing to rezone plaintiffs' tract of land as requested unless they dedicated a strip on which geothermal wells were located. A statute authorizing public ownership of geothermal resources was considered insufficient evidence of an express state policy to replace competition in the market with city geothermal districts. Moreover, even were such a policy inferred, the Court found no "authorization for a city to undertake anticompetitive actions in its effort to establish such a district," 716 F.2d at 664.

> [M]erely because the state may authorize a city to be the sole supplier of a natural resource and to set prices for that resource, it does not necessarily follow that the city is immunized from antitrust liability when it attempts to tie the purchase of a nonmonopolized product or service to the sale of that natural resource. As the plurality stated in *Lafayette*, "even a lawful monopolist may be subject to antitrust restraints when it seeks to extend or exploit its monopoly in a manner not contemplated by its authorization."

*Id.* at 663.

The Ninth Circuit has cautioned, however, that the state legislature need not be found to have "contemplated the precise action complained of as long as it contemplated the kind of action to which objection was made," *Benson v. Arizona State Board of Dental Examiners*, 673 F.2d 272, 276 n. 8 (9th Cir.1982). There, defendant medical examining Board was held immune under *Midcal* even though the state statute authorizing the Board to decide the manner in which licensing exams are given "did not

itself lay down all the requirements that the Board imposed," *id.*

### D. Traditional Municipal Function.

Defendants argue that the provision of emergency ambulance service and paramedic certification is a traditional municipal function and that the second requirement of the *Golden State Transit* test for local governments is thus satisfied. *See, e.g., City of Lomita v. County of Los Angeles*, 148 Cal.App.3d 671, 196 Cal.Rptr. 221, 223 (1983). Plaintiff points out that some of the defendants are private entities and that the more rigorous standard of "active state supervision" set forth in *Midcal* might apply. But it agrees for purposes of this motion that "the local government immunity standard is the appropriate measure to apply to all defendants," pl's opp at 18 n. 28.

Plaintiff effectively concedes, then, that the second *Golden State Transit* requirement is satisfied. California law establishes that the regulation and provision of emergency medical care in which the County is alleged to have engaged is a traditional municipal function. *See, e.g.,* Cal.Gov.Code § 54980(c); *id.* § 25210.4a(8); *id.* §§ 38794, 54981. Moreover, the restraint challenged arises from the County's certification process, not from any delegation of authority to the private defendants as in *Midcal*. There is therefore no requirement of state supervision and the *Golden State Transit* standard controls.

### E. Express State Policy

To establish the necessary state policy, defendants rely primarily on the WTPA and the EMS Act.[5] They claim that those statutes establish a comprehensive regulatory scheme for the provision of paramedic service which seeks to displace competition in the medical care market. They also

---

**5.** Defendants also cite other statutes and regulations regarding emergency medical care. Cal. Veh.Code §§ 2416(b) and 2501, for example, provide for state licensing of privately owned ambulances, and Cal.Admin.Code, Title 13, §§ 1100.3, 1101 and 1102 require that they be staffed by a certified driver and attendant. Fur-

ther, ambulances must be provided with certain emergency equipment, *id.* § 1103, 1103.2, and ambulance personnel must comply with specified duties, *id.* 1104, 1105, 1106. These provisions do not bear, however, on the anticompetitive method of paramedic certification alleged here.

claim that the acts anticipate the selective certification of paramedics in which they are alleged to have engaged.

■ There is no doubt that the WTPA and EMS Act establish a policy to displace competition in the field of emergency medical care and paramedic services, thus meeting the first prong of the express state policy requirement under *Golden State Transit*. Both statutes authorize counties to train and supervise paramedics. They establish minimum training standards but permit counties to establish more exacting ones. More significantly, the EMS Act specifically bars persons who are not part of a county's emergency medical services system from providing paramedic care, Cal. Health & Saf.Code § 1797.178. Similarly, both the WTPA and EMS Act prohibit any individual who is not county-certified from holding himself out as a paramedic, *id.* §§ 1484.4, 1797.177. The express authority granted counties in these provisions to arrange for and supervise paramedic service necessarily implies that choices among competitors must be made for "the best and most efficient and economic delivery of emergency medical services," *id.* § 1485, in accordance with state and local regulatory requirements. As in *Golden State Transit*, the statutory language evidences an intent to "displace unregulated competition" in a field where quality and cost control are vitally important state interests.

### F. *Legislative Contemplation.*

■ A separate issue is whether the state legislature anticipated the "kinds of actions [here] alleged to be anticompetitive," 726 F.2d at 1433. Although the County need not "point to a specific, detailed legislative authorization" to certify only the paramedics of a particular company, *Lafayette*, 435 U.S. at 15, 98 S.Ct. at 1148, it does need to show that the state authorization to displace competition with regulation of paramedic services includes authorization "to undertake anticompetitive actions" of the kind alleged, *Parks*, 716 F.2d at 664.

To begin with, the EMS Act on its face authorizes the type of activity alleged here. Besides establishing detailed regulations for the provision of emergency medical care in general, the Act specifies that the County's WTPA pilot program or EMS system of public and private agreements for advanced life support care is to be *exclusive*. As previously noted, under § 1797.-178, no individual who is not part of a county's WTPA program or EMS system may provide paramedic service.

The statutory provisions on which plaintiff relies provide that the County "shall certify" qualified paramedic applicants. However, they constitute only part of the emergency medical system envisioned by the Act. County certification is designed to ensure quality control of paramedic care by establishing minimum standards of competency. Restricting the performance of paramedic services to persons who are a part of the County's EMS system or pilot program serves other and equally important goals of ensuring coordination, adequate base-hospital supervision, and cost-efficiency. The certification provisions do not evince an intent to obstruct those goals by requiring counties to include *all* qualified applicants in their emergency medical care systems.

■ Under *Lafayette*, the state need not be found to have intended the precise action complained of, *Benson, supra*, 673 F.2d at 276 n. 8, i.e. the certification only of a particular company's employees. Rather, it must have contemplated the kind of action undertaken, i.e. restriction of paramedic services pursuant to an emergency medical care system. This it clearly did.

■ The EMS Act, and in particular § 1797.178, did not take effect, however, until January 1, 1981, eight months after the anticompetitive activity is alleged to have begun. The WTPA, which was already in effect and on which defendants must rely, does not contain a provision comparable to § 1797.178. Instead it merely authorizes Counties to train and certify mobile intensive care paramedics and sets

minimum standards for certification. Nothing in the statute indicates any legislative intent to restrict provision of paramedic care to those contracting or otherwise connected with the County. The concept of "emergency medical system," the cornerstone of the subsequently enacted EMS act, does not appear in the WTPA, the certification provisions of which are the sole source of authority for County control of paramedic service, *cf. Santa Ana Tustin Community Hosp. v. Board of Supervisors of County of Orange,* 127 Cal. App.3d 644, 179 Cal.Rptr. 620 (1982) (WTPA sole source of authority for county to establish trauma centers).

There is also no indication in the Act that the number of certified paramedics should be limited. In *Golden State Transit,* an intent to limit the number of taxicab franchises could be found in § 5375.1 of the PCPCA which provides for certification only if "existing service is inadequate," 726 F.2d at 1430. Here, in contrast, the WTPA provides for certification only as a means to ensure quality medical care and expresses an intent to "respond to the critical shortage of professionally trained medical and nursing personnel," § 1485.

In sum, the restriction of paramedic services adopted by the County finds express authority in the comprehensive provisions of the EMS Act and specifically in § 1797.-178. That section empowers counties to develop emergency medical systems of precisely the kind challenged by plaintiff here. Defendants are thus immune from antitrust liability for conduct undertaken after January 1, 1981, when the EMS Act took effect. From March until December of 1980, however, defendant County was acting pursuant to the provisions of the WTPA which does not expressly authorize defendant County's limitation on paramedic certification. The County may thus be lia-

ble for antitrust damages suffered during that ten-month period.

This conclusion is not inconsistent with the holding in *Springs Ambulance Service v. City of Rancho Mirage, Cal.,* 1983–2 Trade Cas. (CCH) ¶ 65,646 (D.C.Cal.1983), *appeal pending.* There the district court found that the EMS Act did not contemplate the complete displacement of competition in the ambulance industry and that defendant city's alleged participation in fixing the maximum prices to be charged by ambulance services at a predatorily low level so as to benefit its own business over plaintiff's was not immune from antitrust scrutiny. Defendants' motion to dismiss was denied inasmuch as "none of the California statutes and regulations cited by defendants can be used as a shield against these allegations."

Here, in contrast, § 1797.178 of the EMS Act specifically authorizes the creation by counties of emergency medical systems as the exclusive provider of paramedic and other emergency care. The authority necessarily permits the County to decide which private health care companies may participate in the system and in what capacity. It does not necessarily permit, as the *Springs* court found, a county to set predatorily low prices to favor its own business.

Finally, *Gold Cross Ambulance and Transfer, Inc. v. City of Kansas City,* 705 F.2d 1005, 1012–14 (8th Cir.1983), *appeal pending,* in which plaintiffs challenged a city's grant of an exclusive ambulance service contract to a competitor, supports defendants' reading of the EMS Act. The court there found that monopoly service was a "necessary or reasonable consequence"[6] of the statutory authorization "to contract with one or more" ambulance operators and the provision for state licensing upon a finding that "public convenience and necessity requires the proposed ambulance service, *id.* at 1013; thus, the "kind

---

6. Plaintiff argues that the Ninth Circuit has rejected this formulation of the "express state policy" standard in *Golden State Transit* which requires contemplation of the kind of action challenged. *But see* Areeda, *Antitrust Immunity for "State Action" after Lafayette,* 95 Harv.L.Rev.

435, 446 (1981). The distinction plaintiff draws is more apparent than real. Finding that an action is contemplated by the state legislature hardly differs from finding the action to have been a reasonable or foreseeable consequence of authorized conduct.

of action" undertaken was contemplated by the legislature.[7] Plaintiff here similarly challenges the County's decision to certify only its primary providers' employees as part of its emergency medical system. Defendants cite, however, no provision in the WTPA regarding paramedics analogous to those regarding contracting or licensing in *Gold Cross Ambulance* nor is the restriction a "necessary or reasonable" consequence of the provisions of the WTPA that they do cite.

### G. Tenth Amendment Immunity

Defendant County next argues that the imposition on it of antitrust liability would violate the Tenth Amendment. It relies on *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976) (application of Fair Labor Standards Act to local governments violates Tenth Amendment), and *Hodel v. Virginia Surface Mining and Reclamation Ass'n*, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), which establishes a three-prong test for invalidating federal legislation under the Tenth Amendment:

> First, there must be a showing that the challenged statute regulates the "States as States." Second, the federal regulation must address matters that are indisputably "attribute[s]" of state sovereignty." And third, it must be apparent that the States' compliance with the federal law would directly impair their ability "to structure integral operations in areas of traditional governmental functions."

452 U.S. at 287–88, 101 S.Ct. at 2365–66.

Defendant city in *Springs Ambulance Service* made a similar claim and the district court's rejection of it is well-reasoned. The court noted that the *Hodel* standard and *EEOC v. Wyoming*, 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983), have cut back significantly on *National League of Cities'* broad extension of Tenth Amendment protection to municipalities. It also

found that the Sherman Act posed no threat to the sovereignty of California in regulating ambulance service because "the doctrine of state action immunity amply protects defendants from all of the Tenth Amendment abuses they cite," at 69,286. Inasmuch as the state had not contemplated the kind of activity in which the city had engaged, there was no danger of regulation of the "state as state," no interference with attributes of state sovereignty, and no impairment of the state's ability to structure operations. In sum, because the goals of the *Parker* exemption and the Tenth Amendment are analogous—to protect state sovereignty—a finding that a local government's actions are not entitled to state action immunity compels the conclusion that they do not violate the Amendment:

> [a]ny reasoning to the contrary bypasses the fact that, if a municipality is to be accorded the state action exemption, it is because the exemption is derived from the state through specific state legislation.

*Id.* at 69,287.

[6] Here, inasmuch as the WTPA and other statutes relied on did not authorize or contemplate the kind of activity in which defendants are alleged to have engaged prior to 1981, antitrust liability would not impair California's ability to provide adequate paramedical care to its citizens. Moreover, finding anticompetitive conduct which is not protected by the *Parker* doctrine to violate the Tenth Amendment would vitiate *Lafayette* 's clear teaching that unauthorized restraints of trade by a city may violate the antitrust laws.

### H. Noerr-Pennington Immunity

■ The hospital and corporate defendants next move to dismiss on the basis of the *Noerr-Pennington* doctrine. That doctrine, articulated by the Supreme Court in a series of three decisions, *Eastern Rail-*

---

7. *See also Town of Hallie v. City of Eau Claire*, 700 F.2d 376 (7th Cir.1983), *appeal pending*. There the court found certain statutes to evidence a state policy specifically approving de-

fendant city's refusal to provide sewage treatment except to those townships that agreed to annexation by the city.

*road Presidents Conference v. Noerr Motor Freight Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), *United Mine Workers of America v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), and *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), exempts from the antitrust laws joint efforts to influence government decision-making. Defendants claim protection for their alleged persuasion of county officials to grant paramedic certification only to employees of primary providers of emergency ambulance service.

Plaintiff seeks to avoid the *Noerr-Pennington* bar by arguing that the doctrine does not apply whenever a governmental agency conspires with private defendants in a scheme to restrain trade. It relies for this proposition on two decisions. In *Harman v. National Bank of Arizona,* 339 F.2d 564, 566 (9th Cir.1964), the Ninth Circuit reversed the dismissal of a claim that defendants had induced action by the Arizona Attorney General on the ground that *Noerr* did not apply where the complaint alleged the government official to have conspired with defendants. *Duke & Co. Inc. v. Foerster,* 521 F.2d 1277, 1282 (3d Cir.1975), relied on *Harman* to reverse the dismissal of a Sherman Act claim against state governmental entities, holding that *Noerr-Pennington* does not extend the claims of "official participation with private individuals in a scheme to restrain trade."

In *In Re Airport Car Rental,* 521 F.Supp. 568, 589–90 & n. 30, *aff'd,* 693 F.2d 84 (9th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 3114, 77 L.Ed.2d 1368 (1983), this Court noted that the validity of a "co-conspirator" exception to *Noerr-Pennington* is doubtful. A number of courts, including the Ninth Circuit, have reached conclusions contrary to that of *Harman* and *Foerster.* See *Sun Valley Disposal Co. v. Silver State Disposal Co.,* 420 F.2d 341, 342–43 (9th Cir.1969) (*Noerr* and *Pennington* have "eroded the authority of *Harman*"); *Westborough Mall, Inc. v. City of Cape Girardeau,* 693 F.2d 733, 746 (8th Cir.1982), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2122, 77 L.Ed.2d 1303 (1983);

*Metro-Cable Co. v. CATV of Rockford, Inc.,* 516 F.2d 220, 229–30 (7th Cir.1975) ("such a rule would in practice abrogate the *Noerr* doctrine").

■ Whatever the scope of the exception, moreover, plaintiff must allege more than the success of efforts by private enterprises to induce government action. In *Harman,* for example, the complaint alleged that the state Attorney General had, in conspiracy with defendants, filed an action he knew to be baseless which resulted in the closing of plaintiff's business. Similarly, in *Duke,* defendant municipal authorities were alleged to have joined in an agreement to boycott plaintiff's products. Absent proof of such substantial forms of involvement by government officials in an alleged restraint of trade, plaintiff cannot avoid the *Noerr-Pennington* bar by characterizing effective persuasion as conspiracy:

> It would make a nullity of *Noerr* to hold a state [official] to be a co-conspirator, and the petitioning activity directed at it thus unprotected, on the basis that the petitioning was successful. That a public official is persuaded by the entreaty of a lobbyist does not make him the lobbyist's co-conspirator.

*Fed. Prescription Serv. v. Am. Pharmaceutical Ass'n,* 663 F.2d 253, 265 (D.C.Cir.), *cert. denied,* 455 U.S. 928, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1981).

Professor Areeda has noted that allegations of conspiracy by public officials to avoid the *Parker* exception aggravate "[t]he usual problems of conclusory antitrust pleadings ... by the failure to define the meaning of 'conspiracy' in this context," *P. Areeda Antitrust Immunity for "State Action" After* Lafayette, 95 Harv. L.Rev. 435, 451–52 (1981):

> Conspiracy connotes an evil or forbidden concert that is wholly lacking when officials agree among themselves on their course of action or when one or more officials adopt a party's position, even if that decision is later held to be unconstitutional, erroneous on the facts, or other-

wise unauthorized by law. Nor can "agreement" over issues of policy—a "policy bias"—be said to constitute a conspiracy. Equally irrelevant, at least when unaccompanied by evidence of impropriety, is the official's previous receipt of a campaign contribution from the party who benefits from the governmental decision. By contrast, the conspiracy characterization is not inapt when the official accepts a bribe from an outsider, decides solely out of personal bias in favor of one party, acts to benefit a personal financial interest in privity with an antitrust plaintiff's rivals, or joins with other agency members to benefit their personal interest.

(Citations omitted). These limitations on the meaning of conspiracy are equally applicable under *Noerr-Pennington:* conspiracy here implies action outside the scope of official duties, such as acts undertaken for personal gain. This does not extend to actions which an official has been persuaded are in the public's interest.

In the case at bench, the hospital and corporate defendants are clearly protected from antitrust liability by *Noerr-Pennington.* Plaintiff alleges that they successfully convinced the County to agree not to certify their competitors' employees as paramedics. Moreover, although the complaint alleges a conspiracy with County officials, it does not claim that they acted for their personal benefit or out of personal bias in favor of the primary providers. Rather plaintiff suggests that they sought to reduce the cost of paramedic care to the County. But that is precisely the kind of "agreement over issues of policy" that cannot be found to withdraw *Noerr-Pennington* protection. Accordingly, hospital and corporate defendants alleged to have influenced the County to certify only primary provider paramedics are immune from liability and the action must be dismissed as to them.

### I. *Disposition.*

For the reasons stated above, the motion to dismiss of defendants Medevac and 911 and of defendant hospitals is granted. The County's motion to dismiss is granted with respect to conduct in which it allegedly engaged subsequent to January 1, 1981, and is denied with respect to conduct in which it allegedly engaged prior to January 1, 1981.

The Court will conduct a status conference on August 31, 1984, at 10 a.m. with the remaining parties to determine what further proceedings are appropriate.

IT IS SO ORDERED.